1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6   ROBIN GRUPCZYNSKI WALTON,                    3:13-cv-00331-MMD-WGC

7                                    Plaintiff,   <u>**REPORT & RECOMMENDATION OF**</u>
                                                  <u>**U.S. MAGISTRATE JUDGE**</u>
8          v.

9   CAROLYN W. COLVIN, Acting Commissioner
    Of Social Security,
10
                                    Defendant.
11

12          This Report and Recommendation is made to the Honorable Miranda M. Du, United

13   States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14   28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Plaintiff

15   Robin Grupczynski Walton's Motion for Reversal of the Commissioner's Decision. (Doc. # 13.)[1]

16   Defendant Commissioner filed a Cross-Motion to Affirm the Commissioner's Decision. (Doc. #

17   16.) After a thorough review, the court recommends that Plaintiff's motion be granted and the

18   Commissioner's motion be denied, and that the action be remanded to the ALJ for payment of

19   benefits.

20                                    **I. BACKGROUND**

21          On March 18, 2009, Plaintiff filed an application for Disability Insurance Benefits (DIB)

22   under Title II of the Social Security Act, alleging an onset of disability beginning February 20,

23   2009. (Administrative Record (AR) 153-157.)

24          The Commissioner denied the application initially and on reconsideration. (AR 124-126,

25   131-133.) Plaintiff made a timely request for a hearing before an Administrative Law Judge

26   (ALJ) to challenge the Commissioner's determination. (AR 134.) The ALJ held two hearings, on

27   ─────────────

28          [1] Refers to court's docket number. Unless otherwise indicated, all page number references are to the court's
    docketed page numbers.

1    March 7, 2011 (AR 77-90) and February 22, 2012 (AR 91-121). Plaintiff was represented by

2    counsel at both hearings. (*Id.*) The ALJ adjourned the first hearing to send Plaintiff for

3    psychological testing. (AR 89-90.) The testing took place, and when the hearing reconvened

4    Plaintiff testified on her own behalf, and a vocational expert also testified. (*Id.* at 77-121.)

5           The ALJ followed the five-step sequential process for evaluating disability claims, set

6    forth in 20 C.F.R. § 1520, and issued a written decision on February 27, 2012, finding Plaintiff

7    was not disabled pursuant to the Social Security Act at any time from the alleged onset date

8    through the date of the decision. (AR 9-17.) Plaintiff appealed and the Appeals Council denied

9    review. (AR 1-3.) Thus, the ALJ's decision became the final decision of the Commissioner.

10          Plaintiff now appeals the ALJ's decision to the District Court. (Doc. # 13.) Plaintiff

11   argues: (1) that the ALJ erred by utilizing an incorrect date for the date last insured (using

12   March 31, 2011 and not June 30, 2012); (2) the improperly rejected the conclusions of

13   consultative examining physician, Dr. Gasparre, and State Agency Medical Consultant,

14   Dr. Villaflor regarding the extent of Plaintiff's physical limitations; (3) the ALJ improperly

15   misapplied or ignored the opinions of consultative examining mental health physician, Dr.

16   Rogina regarding Plaintiff's mental impairments; (4) the ALJ either failed to address or

17   improperly rejected the opinion of Plaintiff's treating physician, Dr. Jempsa; and (5) the ALJ

18   improperly determined Plaintiff's symptom testimony was not credible. Plaintiff asks the court to

19   credit the medical opinions as true, credit Plaintiff's testimony as true, and remand to the ALJ to

20   award benefits.

21          The Commissioner has filed a cross-motion to affirm the ALJ's decision and opposes

22   Plaintiff's motion. (Doc. # 16.) The Commissioner argues: (1) while conceding that the date last

23   insured is June 2012, the ALJ's reference to the earlier date last insured is a difference without

24   significance; (2) the ALJ's differing conclusion on Plaintiff's limitations in reaching and

25   pushing/pulling with the right arm is supported by the ALJ's reliance on the conclusion of

26   consultative examiner, Dr. Gasparre, and even if the ALJ did err by not fully accepting Dr.

27   Villaflor's conclusions, the error is harmless; (3) the ALJ fully considered Dr. Rogina's report

28   and assessment, in concluding Plaintiff's anxiety and personality disorders limited her to work

1   with occasional interaction with the public, co-workers and supervisors and in finding she was

2   limited to simple and detailed work with occasional social interaction; (4) the ALJ properly

3   found Plaintiff less than fully credible; (5) Plaintiff's summary of Dr. Jempsa's evaluations is also

4   inaccurate, as Dr. Jempsa found that notwithstanding Plaintiff's somewhat limited range of

5   motion in her neck, she had full motor strength in all groups and intact sensation; she had

6   "[n]othing acute" in her right shoulder; and her vertebral body heights and spaces were

7   unremarkable; (5) Dr. Jempsa did not make any opinions of disability during the period of time

8   Plaintiff alleges disability (starting February 20, 2009), only that she should be limited to three

9   massages per day, for three days a week. (Doc. # 16.)

## II. STANDARD OF REVIEW

11          The court must affirm the ALJ's determination if it is based on proper legal standards and

12   the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

13   *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is

14   'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

15   reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-

16   24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

17          To determine whether substantial evidence exists, the court must look at the record as a

18   whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*,

19   740 F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may

20   not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

21   --- F.3d --- , 2014 WL 3397218, at * 11 (9th Cir. July 14, 2014) (quoting *Lingenfelter v. Astrue*,

22   504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible for determining credibility,

23   resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id.* (quoting *Andrews v.*

24   *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either

25   affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the

26   Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21

27   (9th Cir. 1996)). That being said, "a decision supported by substantial evidence will still be set

28   aside if the ALJ did not apply proper legal standards." *Id.* (citing *Bray v. Comm'r of Soc. Sec.*

1    *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir.

2    2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability

3    determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, --

4    - F.3d --- , 2014 WL 3397218, at * 11 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir.

5    2003)).

6    ## III. DISCUSSION

7    **A. Five-Step Sequential Process**

8    Under the Social Security Act, "disability" is the inability to engage "in any substantial

9    gainful activity by reason of any medically determinable physical or mental impairment which

10    can be expected to result in death or which has lasted or can be expected to last for a continuous

11    period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined

12    to be under a disability only if his physical or mental impairment or impairments are of such

13    severity that he is not only unable to do his previous work but cannot, considering his age,

14    education, and work experience, engage in any other kind of substantial gainful work which

15    exists in the national economy, regardless of whether such work exists in the immediate area in

16    which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if

17    he applied for work." 42 U.S.C. § 1382c(a)(3)(b).

18    The Commissioner has established a five-step sequential process for determining whether

19    a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S.

20    137, 140-41 (1987). If at any step the Social Security Administration (SSA) can make a finding

21    of disability or nondisability, a determination will be made and the SSA will not further review

22    the claim. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4); *see also Barnhart v. Thomas*, 540

23    U.S. 20, 24 (2003). "'The burden of proof is on the claimant at steps one through four, but shifts

24    to the Commissioner at step five.'" *Garrison*, --- F.3d --- , 2014 WL 3397218, at * 13 (quoting

25    *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)).

26    In the first step, the Commissioner determines whether the claimant is engaged in

27    "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied.

28    20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant

1    is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

2           The second step requires the Commissioner to determine whether the claimant's

3    impairment or a combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and

4    § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits

5    the claimant's physical or mental ability to do basic work activities. *Id*. Basic work activities are

6    "the abilities and aptitudes necessary to do most jobs[,]" which include:

7           (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling,
            reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking;
8           (3) Understanding, carrying out, and remembering simple instructions; (4) Use of
            judgment; (5) Responding appropriately to supervision, co-workers and usual
9           work situations; and (6) Dealing with changes in a routine work setting.

10   20 C.F.R. §  404.1521 and §  416.921. If a claimant's impairment is so slight that it causes no

11   more than minimal functional limitations, the Commissioner will find that the claimant is not

12   disabled. 20 C.F.R.§  404.1520(a)(4)(ii), (c) and 416.920(a)(ii). If, however, the Commissioner

13   finds that the claimant's impairment is severe, the Commissioner proceeds to step three. *Id*.

14          In the third step, the Commissioner looks at a number of specific impairments listed in 20

15   C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the

16   impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R.

17   § 404.1520(a)(4)(iii), (d) and §  416.920(a)(4)(iii), (c). The Commissioner presumes the Listed

18   Impairments are severe enough to preclude any gainful activity, regardless of age, education, or

19   work experience. 20 C.F.R. §  404.1525(a). If the claimant's impairment meets or equals one of

20   the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed

21   disabled. 20 C.F.R. §  404.1520(a)(4)(iii), (d), §  416.920(d). If the claimant's impairment is

22   severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to

23   step four. *Yuckert*, 482 U.S. at 141.

24          At step four, the Commissioner determines whether the claimant can still perform "past

25   relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past

26   relevant work is that which a claimant performed in the last fifteen years, which lasted long

27   enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R.

28   § 404.1565(a) and § 416.920(b)(1).

- 5 -

In making this determination, the Commissioner assesses the claimant's "residual functional capacity" (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of limitation, and medical reports, to determine what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and § 416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled for purposes of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally, a claimant who is physically and mentally capable of performing past relevant work is not disabled, whether or not he could actually obtain employment.").

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

"The grids are matrices of the four factors identified by Congress—physical ability, age,

education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age, education and work experience. *Id*. For each combination of factors, the Grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in that category. *Id*.

The Commissioner may not rely solely on the Grids unless they accurately and completely describe the claimant's abilities and limitations. *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985) (citation omitted). The ALJ must take the testimony of a vocational expert where the claimant suffers from non-exertional limitations that are "sufficiently severe so as to significantly limit the range of work permitted by his exertional limitation." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (internal quotation marks and citation omitted).[2] Further, where the Commissioner finds that a nonexertional limitation alone is severe (at step two of the sequential process) (absent any exertional limitation), the Commissioner is not required to seek the assistance of a vocational expert at step five unless the nonexertional limitations are "significant, sufficiently severe, and not accounted for in the grid[s]." *See id*. at 1076.

If the ALJ relies on a vocational expert, he can call upon the vocational expert to testify as to: "(1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the availability of such jobs in the national economy.'" *Garrison,* --- F.3d --- , 2014 WL 3397218, at * 13 (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999) (alteration original)). "The

---

[2] "[S]atisfaction of the step two threshold requirement that a claimant prove her limitations are severe is not dispositive of the step-five determination of whether the non-exertional limitations are sufficiently severe such as to invalidate the ALJ's exclusive use of the grids without the assistance of a vocational expert." *Hoopai*, 499 F.3d at 1076.

ALJ may pose hypothetical questions to the expert that 'set out all of the claimant's impairments' for the VE's consideration." *Id.* (quoting *Gamer v. Secretary of Health and Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)). "'The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record.'" *Id.* (quoting *Tackett*, 180 F.3d at 1101). "The testimony of a [VE] is valuable only to the extent that it is supported by medical evidence' and has 'no evidentiary value if the assumptions in the hypothetical are not supported by the record.'" *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989)).

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

**B. ALJ's Findings in this Case**

**1. Step One**

In the present case, the ALJ applied the five-step sequential evaluation process and found, at step one, that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of February 20, 2009. (AR 11.)

**2. Step Two**

At step two, the ALJ found it was established that Plaintiff suffered from the following severe impairments: cervical, lumbar, and right shoulder strain; and pain disorder, anxiety disorder and personality disorder. (AR 11.)

**3. Step Three**

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 11.) The ALJ noted that Plaintiff had mild restrictions in activities of daily living, social functioning, and concentration, persistence or pace with no episodes of decompensation of extended duration; however, because the impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the

"paragraph B" criteria were not satisfied. (AR 12.) The ALJ found there was no evidence that Plaintiff had a complete inability to function independently outside of her home. (AR 12.)

### 4. Step Four & RFC

At step four, the ALJ found Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c), except: she is limited to occasional stooping, bending or climbing of ladders, ropes or scaffolds; she is limited to occasional reaching above the shoulder with the right arm; she is able to understand, remember, and carry out simple and detailed instructions; and she is limited to occasional interaction with the public, coworkers and supervisors. (AR 12.)

In making this determination, the ALJ stated that she considered the opinion evidence as well as the claimant's symptoms to the extent they were consistent with objective medical evidence and other evidence. (AR 12.)

The ALJ first discussed the opinion of Dr. Gasparre, a consultative physician, who performed an examination of Plaintiff at the request of the State agency in October 2009. (AR 13.) The ALJ noted that Plaintiff presented to Dr. Gasparre with the chief complaints of neck pain with right upper extremity radicular symptoms, low back pain with bilateral lower extremity radicular symptoms, and right hip pain. (AR 13.) On examination of the neck, Plaintiff reported moderate pain on range of motion, with tenderness to palpation, and with respect to the right upper extremity she reported slight pain on range of motion, negative impingement, normal gross and fine motor skills of the hand and fingers, with 5/5 strength, and sensation intact throughout. On examination of the back, Plaintiff reported slight pain on range of motion and slight tenderness to palpation, and on bilateral straight leg raising testing, she was negative in seated and supine positions. With respect to the right lower extremity, Plaintiff reported moderate pain on range of motion and tenderness to palpation, with 5/5 strength and sensation intact throughout. The examination of the left lower extremity was normal. Plaintiff's gait was normal, without a limp, and she was able to toe walk and heel walk, squat and rise, tandem walk and kneel without difficulty, but with report of right hip pain. She was able to get on and off the examination table without difficulty. The ALJ noted that Dr. Gasparre opined Plaintiff was capable of medium exertional work activity, lifting 50 pounds occasionally and 25 pounds

frequently, standing or walking 6 hours, and sitting 6 hours, in an 8-hour workday. She could frequently balance, kneel, crouch, squat or crawl and occasionally stoop or bend. She could frequently climb ramps or stairs, and occasionally climb ladders or scaffolds. She was limited in her ability to reach with the right upper extremity.

Next, the ALJ discussed that another State agency medical consultant (Dr. Villaflor) considered Plaintiff's complaints of chronic neck pain and numbness of the right upper extremity, and reviewed the medical evidence in the record, including Dr. Gasparre's report, and opined Plaintiff was capable of medium work activity. (AR 13.) She was limited, however, to occasional reaching, pushing and pulling with the right extremity because of right shoulder pain. She could frequently balance, kneel, crouch or crawl, and occasionally stoop. She could frequently climb ramps or stairs, and occasionally climb ladders, ropes, or scaffolds.

The ALJ then noted that Dr. Gasparre was an examining, non-treating physician, whose opinions were based on his examination of Plaintiff. (AR 13.) She noted that she afforded great weight to both Dr. Gasparre and the State agency medical consultant, Dr. Villaflor, as their opinions were consistent with and supported by the medical evidence in the record. (AR 13.)

The ALJ then discussed the findings of Dr. Rogina, who performed a consultative psychological evaluation of the claimant in June 2011. (AR 14.) The ALJ noted that Plaintiff presented with primarily physical complaints, and difficulty remembering dates. On her mental status examination, she presented with normal speech; her affect and mood were congruent; her thought processes and verbalizations were logical, relevant and coherent; she did not have any perceptual problems. She was not depressed but reported being worried about and had significant preoccupation with her physical complaints. She reported a full range of daily activities, limited by her current medical problems, which affected her mood. Significant psychometric testing was administered, and Dr. Rogina diagnosed Plaintiff with pain disorder, anxiety disorder, and personality disorder. She noted that Dr. Rogina opined Plaintiff could understand an extensive variety of simple and 1- or 2-step instructions; her ability to sustain attention, concentration, and exert mental control was in the average range; and she was not socially isolated or withdrawn. The ALJ stated that she considered Dr. Rogina's opinions and conclusions and limited Plaintiff to

simple and detailed work, and occasional social interaction.

Finally, the ALJ turned to Plaintiff's subjective symptom testimony. (AR 14-15.) The ALJ concluded that the objective medical evidence did not fully support Plaintiff's subjective complaints and alleged functional limitations. The ALJ noted that in February 2009, Plaintiff was examined following a report of a work-related injury the previous month.[3] At that examination, Plaintiff reported pain and tenderness with limited range of motion of the cervical spine and right shoulder, and decreased sensation in the right hand. The ALJ states that the examination of the lumbar spine was normal, and an x-ray report of the cervical spine showed possible muscle spasm and minimal anterolisthesis of C2 on C3, but that Plaintiff was asymptomatic in this area. An x-ray of the right shoulder showed nothing acute. Plaintiff was diagnosed with cervical strain, right shoulder strain, low back strain and bilateral carpal tunnel and physical therapy was recommended. The ALJ then mentioned that a February 2006 MRI of the cervical spine showed minimal spondylotic changes after Plaintiff had complained of muscle weakness. The ALJ also referenced Plaintiff complaining of neck pain, numbness and weakness in the left arm in February 2005, and that an MRI of the cervical spine had shown mild degenerative disc disease with no significant spinal stenosis. An MRI of the right shoulder showed some degenerative changes and possible tendonitis, and Plaintiff was diagnosed at that time with cervical strain.

The ALJ discussed Plaintiff's testimony that she last worked in January 2009 because of a work related injury, and that she had worked primarily as a massage therapist but also as an aesthetician. (AR 14.) This work required extensive use of the arms and hands. The ALJ recounted Plaintiff's testimony that her neck and low back cause her the most problems, and that she takes ibuprofen and wears wrist splints. The ALJ referenced Plaintiff's testimony that she could perform some household chores with assistance, and that she needed a 15 minute break between standing, walking and sitting, and had headaches once or twice a week that lasted two to four hours. Finally, the ALJ recited Plaintiff's testimony that she did not receive mental health

---

[3] While the ALJ did not refer to Dr. Jempsa by name, the date referenced by the ALJ coincides with the date of Dr. Jempsa's evaluation of Plaintiff. (*See* AR 14 and AR 215-246.)

treatment and did not take psychotropic medication. (*Id*.)

While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, she concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were consistent with Plaintiff's assessed RFC. (AR 15.)   The ALJ stated that Plaintiff was diagnosed with cervical, lumbar and right shoulder strain but was treated only with over-the-counter ibuprofen. In addition, the ALJ noted that Plaintiff's MRIs had confirmed only mild degenerative changes of the cervical and lumbar spine and right shoulder. The ALJ stated that Plaintiff complained of tenderness and pain on range of motion but objective clinical findings were unremarkable. The ALJ pointed out that while Plaintiff was diagnosed with bilateral carpal tunnel and wore wrist splints, she never treated with an orthopedist, neurosurgeon or other specialist, and did not have any testing to confirm the severity of her condition or undergo other therapy or treatment. The ALJ acknowledged that Plaintiff was limited in her right upper extremity, consistent with her subjective complaints. The ALJ likewise acknowledged Plaintiff was limited by her psychologically-based symptoms, but stated that she was not under the care of a mental health specialist and was not receiving treatment or medication.

The ALJ concluded that the RFC for the narrow range of medium work was consistent with the majority of the medical opinions and the medical evidence contained in the record. (AR 15).

The ALJ then took testimony from the vocational expert, who concluded that an individual with Plaintiff's same age, education and work experience could not return to Plaintiff's prior work as a massage therapist or aesthetician because the demands of these jobs exceeded her RFC. (AR 15.)

**5. Step Five**

Finally, at step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy which the claimant could have performed. (AR 15-16.) The ALJ noted that Plaintiff was fifty-one years old on the date last insured, and then changed age category to that defined as closely

approaching advanced age; she had at least a high school education and was able to communicate in English; and transferability of job skills was not relevant. (AR 15.) The ALJ stated that because Plaintiff's ability to perform all or substantially all of the requirements of the medium range of work was impeded by additional limitations, the ALJ consulted the vocational expert to state whether jobs existed in the national economy that Plaintiff could perform. (AR 16.) The vocational expert testified that given these factors, Plaintiff could perform the requirements of occupations such as a Counter Clerk/Photofinishing (Dictionary of Occupational Titles 249.366-010), light work, unskilled with an SVP of 2, and that there were 300,000 such jobs available in the national economy. (AR 16.) On this basis, the ALJ concluded that a finding of not disabled was appropriate. (AR 16.)

**C. Last Insured Date**

The Commissioner concedes that the date last insured is June 30, 2012. (Doc. # 16 at 2 n. 1, 7.) The court agrees with the Commissioner that the ALJ's reference to a date last insured of March 31, 2011, is without significance because the ALJ addressed and considered Plaintiff's medical records beyond the March 31, 2011 date, namely Dr. Rogina's report. The Commissioner is correct that it is Plaintiff's burden to establish disability with medical evidence, and Plaintiff does not contend that there is additional evidence that was submitted beyond the March 31, 2011 date that the ALJ did not consider. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1514.

In addition, at step five the ALJ took into account that Plaintiff was passing into the category of closely approaching advanced age. (AR 15.) This obviates Plaintiff's argument that the step five analysis is flawed because it relied on an earlier age group.

Therefore, the erroneous reference to the March 31, 2011 date is harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation omitted) ("we may not reverse an ALJ's decision on account of an error that is harmless"). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). Having failed to demonstrate harm as a result of this error, the court finds the Commissioner's decision should not be remanded on this basis.

**D. Plaintiff's RFC and Step Five Determination**

    **1. Medical Opinions**

    A claimant must establish disability as a result of "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(a)(1). Evidence of this may include medical opinions which are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite the impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Medical opinions are considered with other relevant evidence. 20 C.F.R. § 404.1527(b).

    All medical opinions are to be evaluated by the ALJ. 20 C.F.R. § 404.1527(c). "'In disability benefits cases...physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison*, --- F.3d---, 2014 WL 3397218, at * 13 (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). The court "'distinguish[es] among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians).'" *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Treating physicians' opinions are generally given more weight than examining or non-examining physicians. *Id*. In addition, "the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Id*. (citing *Ryan*, 528 F.3d at 1198). "The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Id*. (internal quotation marks omitted).

    Treating provider opinions are generally given "controlling weight" "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). This is so long as the treating opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

"The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." *Magallanes*, 881 F.2d at 751 (citations omitted). "[T]he ALJ need not accept a treating physician's opinion which is 'brief and conclusory in form with little in the way of clinical findings to support [its] conclusion.'" *Id.* (quoting *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986)). "To reject the uncontroverted opinion of a claimant's physician, the ALJ must present clear and convincing reasons for doing so." *Id.* (citations omitted).

"'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (quoting *Ryan*, 528 F.3d at 1198). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings.'" *Magallanes,* 881 F.2d at 751 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (quoting *Reddick*, 157 F.3d at 725).

If a treating source's opinion is not given controlling weight, the ALJ "must apply the factors set forth in 20 C.F.R. § 404.1527(c)(2)(i)-(ii) and (c)(3)-(6) in determining how much weight to give each opinion." *Garrison*, ---F.3d---, 2014 WL 3397218, at n. 11. "These factors are the length of the treatment relationship and the frequency of the examination, § 404.1527(c)(2)(i), nature and extent of the treatment relationship, § 404.1527(c)(ii), 'supportability,' § 404.1527(c)(3), consistency,§ 404.1527(c)(4), specialization, § 404.1527(c)(5),

- 15 -

1    and other factors that tend to support or contradict the opinion, § 404.1527(c)(6)." *Id*. "This is so

2    because, even when contradicted, a treating or examining physician's opinion is still owed

3    deference and will often be 'entitled to the greatest weight...even if it does not meet the test for

4    controlling weight.'" *Id*. at * 14 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

5         "Where an ALJ does not explicitly reject a medical opinion or set forth specific,

6    legitimate reasons for crediting one medical opinion over another, he errs." *Id*. (citing *Nguyen v.*

7    *Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)). "In other words, an ALJ errs when he rejects a

8    medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting

9    without explanation that another medical opinion is more persuasive, or criticizing it with

10   boilerplate language that fails to offer a substantive basis for his conclusion." *Id*.

11              **a. Dr. Gasparre and Dr. Villaflor-Plaintiff's physical limitations**

12        Plaintiff first points out that the ALJ states in her decision that she accorded great weight

13   to the medical opinions and conclusions of Dr. Gasparre and the State Agency Medical

14   Consultant, Dr. Villaflor. (Doc. # 13 at 12.) In her RFC analysis, however, the ALJ found

15   Plaintiff would be limited to occasional reaching above the shoulder with the right arm while

16   Dr. Villaflor concluded Plaintiff was limited to occasional reaching in all directions (not just

17   overhead) due to right shoulder pain. (*Id.*) Plaintiff also asserts that Dr. Villaflor limited Plaintiff

18   to occasional use of the right upper extremity for pushing and pulling while the ALJ gave no

19   limitation for pushing and pulling in the RFC. (*Id.*)

20        The Commissioner acknowledges that differences between Dr. Villaflor's opinions and

21   the restrictions afforded Plaintiff in the RFC assessment. (Doc. # 16 at 8.) The Commissioner

22   argues, however, that the ALJ's conclusion was supported by reference to evidence from

23   Dr. Gasparre, who found full strength in Plaintiff's right arm, intact sensation, numbness and

24   only slight pain. (*Id.*) In addition, the Commissioner argues that any error in not fully accepting

25   Dr. Villaflor's conclusions is harmless because the job the ALJ found Plaintiff could perform at

26   step five, a counter clerk in the photofinishing industry, DOT # 249.366-010, includes only

27   occasional reaching, and the job description contains nothing consistent with pushing and pulling

28   on any more than an infrequent basis. (Doc. # 16 at 8, n. 5.)

- 16 -

1    Plaintiff is correct that the ALJ stated that she considered the findings and conclusions

2    made by both Dr. Villaflor and Dr. Gasparre, and "accord[ed] great weight" to both. (AR 13-14.)

3    The ALJ's RFC determination, however, inexplicably omits any limitation to occasional reaching

4    with the right upper extremity (not just occasional reaching above the shoulder) and any

5    limitation on pushing or pulling as Dr. Villaflor had opined. As a result, the ALJ erred. *See*

6    *Garrison*, ---F.3d---, 2014 WL 3397218, at * 14 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464

7    (9th Cir. 1996)) ("Where an ALJ does not explicitly reject a medical opinion or set forth specific,

8    legitimate reasons for crediting one medical opinion over another, he errs.").

9    The Commissioner first contends that the ALJ's determination was supported by the

10    ALJ's reference to Dr. Gasparre's opinions, who found Plaintiff had full strength in her right arm,

11    intact sensation, numbness and only slight pain. (Doc. # 16 at 8.) The Commissioner's argument

12    ignores the ALJ's statement that she considered the findings of both Dr. Villaflor and Dr.

13    Gasparre and gave them both great weight. While her RFC assessment did not contain

14    Dr. Villaflor's limitations, the ALJ never stated that she was rejecting them. Nor did the ALJ

15    state, as the Commissioner argues now, that she was rejecting Dr. Villaflor's conclusions

16    regarding Plaintiff's physical limitations because of Dr. Gasparre's opinions regarding Plaintiff's

17    right extremity strength. The court can "review only the reasons provided by the ALJ in the

18    disability determination and may not affirm the ALJ on a ground upon which he did not rely."

19    *Garrison*, --- F.3d --- , 2014 WL 3397218, at * 11 (citing *Connett v. Barnhart*, 340 F.3d 871, 874

20    (9th Cir. 2003)). Therefore, the Commissioner's argument, made with the benefit of hindsight, is

21    unavailing.

22    The Commissioner also argues that even if the ALJ did err in not including these

23    limitations in her RFC assessment, such error is harmless because the job the ALJ concluded

24    Plaintiff could perform in the national economy only includes occasional reaching and "the job

25    description contains nothing consistent with pushing and pulling on any more than an infrequent

26    basis." (Doc. # 16 at 8:17-18.)

27    In questioning the vocational expert at stage five (assessing whether or not the claimant

28    could perform other work in the national economy), the ALJ's hypothetical referenced a person

- 17 -

of Plaintiff's age, education and vocational background capable of doing medium work, but with the added limitation of occasional right-sided pushing and pulling overhead and occasional handling and reaching overhead. (AR 106-110.) There was no mention of a limitation of pushing or pulling with the right extremity other than in an overhead direction, as Dr. Villaflor had opined. The description of the job discussed by the vocational expert is as follows:

> 249.366-010 COUNTER CLERK
> Industry Designation: Photofinishing Industry
> Receives film for processing, loads film into equipment that automatically processes film for subsequent photo printing, and collects payment from customers of photofinishing establishment: Answers customer's questions regarding prices and services. Receives film to be processed from customer and enters identification data and printing instructions on service log and customer order envelope. Loads film into equipment that automatically processes film, and routes processed film for subsequent photo printing. Files processed film and photographic prints according to customer's name. Locates processed film and prints for customer. Totals charges, using cash register, collects payment, and returns prints and processed film to customer. Sells photo supplies, such as film, batteries, and flashcubes.

DICOT 249.366-010.

> The DOT contains the following strength guidelines for this position:
> Light Work - Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

*Id.* The description further asserts that the job includes occasional reaching (up to 1/3 of the time). *Id.* The description does not discuss whether the job involves pushing or pulling. Interestingly, other categories of physical limitation that are not part of the job, *i.e.,* climbing, balancing, stooping, kneeling, are described as "[a]ctivity or condition does not exist," while the limitations on pushing and pulling are not mentioned. While the Commissioner interprets this, along with the general job description, to mean that there is "nothing consistent with pushing and pulling on any more than an infrequent basis," that is not readily apparent from the DOT description. It is plausible that the activities of receiving film for processing, loading film into equipment, and routing processed film involve pushing and pulling on more than an infrequent

1   basis in a direction other than overhead. The ALJ did not pose a hypothetical individual with a

2   limitation of occasional pushing and pulling *in any direction* (not just overhead) to the vocational

3   expert; therefore, the court concludes that the ALJ erred, and the Commissioner has not

4   sufficiently demonstrated that such error is harmless.

5   **b. Dr. Rogina-Plaintiff's Mental Limitations**

6   Next, Plaintiff argues that with respect to her mental impairments, the ALJ essentially

7   "cherry-picked" portions of Dr. Rogina's report to support her conclusion regarding Plaintiff's

8   RFC. (Doc. # 13 at 12-13.) She asserts that the ALJ ignored Dr. Rogina's findings, in particular

9   Dr. Rogina's conclusion that Plaintiff's ability to sustain employment was marginal, her finding

10  that Plaintiff had moderate limitations in the ability to make judgments on simple work related

11  decisions, to understand and remember complex instructions, to carry out complex instructions,

12  to make judgments on complex work-related decisions, to interact appropriate with supervisors

13  and co-workers. (*Id*. at 13.) Nor did the ALJ consider Dr. Rogina's opinion that Plaintiff has a

14  "marked" limitation in the ability to respond appropriately to a usual work situation and to

15  changes in a routine work setting. (*Id*.)

16  The Commissioner asserts that the ALJ concluded Plaintiff had anxiety and personality

17  disorders and as a result limited Plaintiff to work with occasional interaction with the public, co-

18  workers and supervisors. (Doc. # 16 at 9.) The Commissioner contends that the ALJ fully

19  considered Dr. Rogina's report and assessment, and considering the record as a whole, including

20  Plaintiff's range of daily activities, properly assessed her RFC. (*Id*. at 9-10.) The Commissioner

21  argues that the ALJ's RFC finding need not exactly match the limitations assessed from any

22  medical source, but must be based on the ALJ's analysis of the record as a whole. (*Id*. at 10.)

23  The Commissioner also contends that Dr. Rogina's assessment that Plaintiff had "moderate"

24  mental limitations does not adversely affect the ALJ's assessment because such limitations in

25  maintaining attention and concentration do not warrant further limitation. (*Id*. at 11, n. 7.)

26  In Plaintiff's RFC assessment, the ALJ stated that Plaintiff could perform medium work,

27  except, as it pertains to mental impairments, she "would be able to understand, remember, and

28  carry out simple and detailed instructions" and she "would be limited to occasional interaction

with the public, coworkers, and supervisors." (AR 12.) She noted that Plaintiff presented with primarily physical complaints, and difficulty remembering dates, normal speech, congruent affect and mood, logical, relevant and coherent thought processes and verbalizations, and no perceptual problems. (AR 14.) The ALJ then stated that Plaintiff reported a full range of daily activities, limited by her current medical problems which affect her mood. (AR 14.) The ALJ noted the psychological testing that was administered and Dr. Rogina's diagnosis of pain disorder, anxiety disorder and personality disorder. (AR 14.) She likewise stated that Dr. Rogina opined Plaintiff was able to understand an extensive variety of simple and 1- or 2-step instructions; her ability to sustain attention, concentrate and exert mental control was in the average range; and that she was not socially isolated or withdrawn. (AR 14.) Finally, the ALJ indicated that she considered the opinions and conclusions of Dr. Rogina in limiting Plaintiff to simple and detailed work and occasional social interaction. (AR 14.)

Dr. Rogina performed a consultative examination and evaluation of Plaintiff on June 8, 2011. (AR 301.) Plaintiff reported carpal tunnel on both hands, a bulging disc in her neck, a sore shoulder, a hard time remembering dates, and legs that give out. (AR 301.) She did not have a psychiatric treatment history. (AR 301.) When asked about her employment history, she relayed that she had previously worked as a therapist and aesthetician, and prior to that as a bookkeeper. (AR 302.) She reported that at the time of her examination her hands were swollen and her legs gave out, and she had poor concentration and attention. (AR 302.) She did not believe she was depressed. (AR 302.)

Dr. Rogina assessed Plaintiff as follows at the examination: normal quality of speech; a congruent mood for the situation; reported worrying about her son getting hurt and her medical problems; logical, relevant and coherent responses; significant preoccupation with medical problems; oriented to time, place, person and purpose; without perceptual problems; sleeping well. (AR 303-304.)

Plaintiff then described her daily activities, which Dr. Rogina assessed as being limited by her current medical problems. (AR 304-305.)

Plaintiff was administered various psychological tests. The Bender Gestalt Test indicated

an absence of brain impairment. (AR 305.) On the Wide Range Achievement Test, Plaintiff scored in the average range for word/reading, sentence comprehension, math computation and reading composite, and in the low range in spelling. (AR 305.) On the Comprehensive Trail-Making Test (described as being helpful in assessing the detection of frontal lobe deficits) she scored below average in four of the five categories, and in the remaining category she scored as moderately impaired. (AR 305-306.) Her composite score for that test was below average. (AR 306.) On the Wechsler Adult Intelligence Scale, Plaintiff's general cognitive ability, general verbal comprehension abilities, and general perceptual reasoning abilities were in the low average range. (AR 306.)

Her ability to sustain attention, concentrate and exert mental control was in the average range, while her ability in processing simple or routine visual material without making errors was in the borderline range. (AR 306.)

On the Minnesota Multiphasic Personality Inventory-2, Plaintiff was found to be open and cooperative, and it was stated that this was probably a good indication of Plaintiff's present level of personality functioning. (AR 306.) Her profile suggested that she was reporting a number of vague physical complaints, and has a tendency to develop physical problems when she is under stress. (AR 306.)

Dr. Rogina stated: "She may not now be greatly incapacitated by her physical symptoms. She tends to rely on hysterical defensives of denial and repression in the face of conflict. She may show a 'Pollyannaish' attitude even though she may express physical complaints that, if genuine, would trouble most other people." (AR 306.) Dr. Rogina assessed gave Plaintiff the following functional assessment:

> [She is] able to understand an extensive variety of simple one or two-step instructions. Her Verbal Reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the Average range...[Plaintiff's] ability to sustain attention, concentrate and exert mental control is in the Average range...[Her] abilities to sustain attention, concentrate, and exert mental control are better developed than her non-verbal reasoning abilities. [Her] ability in processing simple or routine visual material without making errors is in the Borderline range...Interpersonally, this claimant is somewhat passive-dependent and demanding in relationships. Although she may at first appear skillful in handling social relationships, she tends to be rather immature, superficial and unskilled with people. Individuals with this profile tend to use physical complaints to influence other people. She has an average interest in being with others and is not socially isolated or withdrawn. She meets and talks with other

people with relative ease and is not overly anxious at social gatherings. She may tend to play the role of the weak, helpless child if her spouse is stronger and protective of her.

(AR 306-307.)

Dr. Rogina diagnosed Plaintiff with pain disorder associated with both psychological factors and her general medical condition, which Dr. Rogina described as chronic; anxiety disorder; and personality disorder. (AR 307.) She was assessed as having a Global Assessment of Functioning (GAF) score of 50. (AR 307.)[4]

Regarding Plaintiff's prognosis, Dr. Rogina opined: "[her] ability to sustain employment is assessed as marginal at this time. Her medical problems, her Anxiety Disorder problems, her significant Personality Disorder problems deem her prognosis chronic and stable." (AR 307.)

Dr. Rogina also included a medical source statement regarding Plaintiff's mental ability to do work-related activities. (AR 309-311.) This statement indicated that Plaintiff's ability to understand, remember and carry out instructions was affected by her mental impairments. (AR 309.) Plaintiff was noted as having mild limitations in the ability to understand, remember and carry out simple instructions. (AR 309.) She had moderate limitations in her ability to make judgments on simple work-related decisions, to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. (AR 309.)

Dr. Rogina concluded that Plaintiff's ability to interact appropriately with supervision, co-workers and the public, and to respond to changes in the routine work setting was affected by her mental impairments. (AR 310.) She was noted as having a mild limitation in her ability to interact appropriately with the public; however, she had moderate limitations in her ability to

---

[4] "'A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.'" *Garrison*, --- F.3d ---, 2014 WL at * n. 4 (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998)). "[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Id.* "Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *Id.* "GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects." *Id.* (citation omitted, but noting: "The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.").

- 22 -

1   interact appropriately with supervisors and co-workers, and a marked limitation in her ability to

2   respond appropriately to usual work situations and to other changes in a routine work setting.

3   (AR 310.)

4          Plaintiff is correct that while the ALJ stated she was relying on Dr. Rogina's conclusions

5   in assessing Plaintiff's RFC, which included limitations of simple and detailed instructions and

6   occasional interaction with the public, coworkers, and supervisors, she did not mention

7   Dr. Rogina's medical source statement, including the moderate limitations in her ability

8   judgments on simple work-related decisions, to understand and remember complex instructions,

9   to carry out complex instructions, and to make judgments on complex work-related decisions;

10  moderate limitations in her ability to interact with supervisors and co-workers, and marked

11  limitations in her ability to respond appropriately to usual work situations and to other changes in

12  a routine work setting. Nor did the ALJ mention Plaintiff's 50 GAF score or Dr. Rogina's opinion

13  that Plaintiff's ability to process simple or routine visual material without error was in the

14  borderline range. Finally, the ALJ completely ignored Dr. Rogina's ultimate conclusion that

15  Plaintiff's ability to sustain employment was marginal at this time, and that her prognosis was

16  chronic and stable.

17         The Commissioner concedes that the ALJ did not reject Dr. Rogina's opinions or set out

18  reasons (clear and convincing or even specific and legitimate reasons if the opinions had been

19  contradicted by another medical source) for rejecting them. (Doc. # 16 at 12:1-3 ("While it is

20  true that the ALJ's decision would be stronger had she expressly rejected Dr. Rogina's

21  inconsistent findings, that does not mean this Court must find the ALJ's decision is not supported

22  by substantial evidence.").)

23         As such, the ALJ did not state what weight she was giving Dr. Rogina's opinions (only

24  that she considered them in forming her RFC assessment) or that she was rejecting certain of

25  Dr. Rogina's opinions. Nor did the ALJ satisfy the standard for rejecting an examining doctor's

26  opinion that was not contradicted by another doctor's opinion—by setting forth clear and

27  convincing reasons for doing so. *See Magallanes*, 881 F.2d at 751 (citations omitted). The

28  Commissioner is in essence arguing, with the benefit of hindsight, that the ALJ's RFC

- 23 -

1    assessment (insofar as it concerned Plaintiff's mental impairments) was proper because

2    Dr. Rogina's evaluation and opinions otherwise justified the conclusion ultimately drawn by the

3    ALJ. That reasoning, however, was not set forth in the ALJ's assessment. Instead of pointing out

4    any perceived inconsistencies in Dr. Rogina's report as a reason for rejecting these opinions, the

5    ALJ merely picked out portions of Dr. Rogina's opinions that supported her RFC determination

6    and neglected those that were adverse without explaining why she was rejecting the adverse

7    opinions. As a result, the ALJ erred. *See Garrison*, --- F.3d ---, 2014 WL at * 14 (citing *Nguyen*

8    *v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)) ("Where an ALJ does not explicitly reject a

9    medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over

10   another, he errs.") ("[A]n ALJ errs when he [or she] rejects a medical opinion or assigns it little

11   weight while doing nothing more than ignoring it[.]").

12                          **c. Dr. Jempsa**

13           Next, Plaintiff contends that the ALJ failed to address the medical opinions of Dr. James

14   Jempsa, an Osteopathic Specialist, who treated Plaintiff, and at various times limited her to

15   modified duty of no massages, up to three massages per day and a sitting desk-type job of four

16   hours per day. (Doc. # 13 at 14-15.)

17           The Commissioner argues that Dr. Jempsa did not make any findings of disability during

18   the period of time that Plaintiff alleges disability, *i.e.*, starting February 20, 2009, only that she

19   should be limited to three massages per day, for three days a week. (Doc. # 16 at 5.) Moreover,

20   the Commissioner contends that Dr. Jempsa's clinical findings showed that notwithstanding

21   Plaintiff's somewhat limited range of motion in her neck and tenderness in the neck and

22   shoulder, Plaintiff had full motor strength in all groups and intact sensation. (*Id.*) The ALJ

23   further asserts that Dr. Jempsa's objective testing revealed "nothing acute" in Plaintiff's right

24   shoulder and unremarkable vertebral body heights and spaces. (*Id.*)

25           To the extent the Commissioner argues that Dr. Jempsa's findings, as a treating physician,

26   were contradicted by other evidence in the record as well as by his own findings, the ALJ was

27   required to "set forth 'specific legitimate reasons...based on substantial evidence in the record.'"

28   *Magallanes*, 881 F.2d at 753 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230

                                            - 24 -

1   (9th Cir. 1987)). "The ALJ [can] meet this burden 'by setting out a detailed and thorough

2   summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

3   making findings.'" *Magallanes*, 881 F.2d at 753 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408

4   (9th Cir. 1986)).

5         While Dr. Jempsa may not have made any definitive findings of disability, he did draw

6   conclusions regarding Plaintiff's ability to work and regarding various limitations that should be

7   placed on her ability to work when she was seen following a work-related injury. (AR 215-246.)

8   While this injury occurred on January 15, 2009, prior to the alleged onset date for disability

9   purposes, Dr. Jempsa's examinations of Plaintiff occurred within the disability period as he

10  examined her on the onset date (February 20, 2009), and  then again on February 27, 2009.

11        When Plaintiff first saw Dr. Jempsa, she reported an injury in the course of performing a

12  deep tissue massage which resulted in sharp pain to her right shoulder and arm followed by

13  swelling in the arm and tingling in her hand. (AR 219.) She took ibuprofen, but ceased doing so

14  because it upset her stomach. (AR 219.) She reported pain in the right shoulder, arm and low

15  back and left hand, and stated she could not do the same number of massages she could perform

16  prior to the injury. (AR 219.) Dr. Jempsa noted no tenderness to palpation to the cervical spine,

17  but there was tenderness to the touch and muscle tightness along the paravertebral musculature

18  from C5 to C7 on the right and over the right trapezius, supraspinatus, and subscapularis on the

19  right. She also had decreased range of motion of the cervical spine, tenderness on the posterior

20  and anterior aspect of the right shoulder, and tenderness in both wrists with decreased sensation

21  over the right fifth finger. (AR 220.) She had motor strength of 5/5 in all groups, and her deep

22  tendon reflexes were 2+/4+. (AR 220.) She had mild decreased range of motion in the lumbar

23  spine. (AR 220.) Her motor strength in the lower extremities was 5/5 in all groups. (AR 220.) X-

24  rays of the cervical spine revealed straightening of the cervical lordosis without acute bony

25  abnormalities and x-rays of the right shoulder revealed no acute bony abnormalities. (AR 220.)

26  She was diagnosed with cervical strain, right shoulder strain, bilateral carpal tunnel, and low

27  back strain. (AR 220.) She was advised to use ice and Tylenol for pain, and was placed in

28  bilateral wrist splits. (AR 220.)  She was scheduled for physical therapy, and placed on modified

1    duty of no more than three massages per day for three days a week. (AR 221.)

2         Plaintiff was seen by Dr. Jempsa again on February 27, 2009, and complained that she

3    continued to have neck pain, right shoulder pain and numbness in her right and left hand, and

4    mild low back discomfort. (AR 215.) She was noted as having tenderness and muscle tightness

5    along the paravertebral musculature from C5 to C7 on the right, and decreased range of motion

6    of the cervical spine. (AR 215.) She had tenderness of the posterior and anterior aspects of the

7    right shoulder, as well as decreased range of motion. (AR 215.) She had decreased sensation over

8    the anterior aspect of the right hand, but her motor strength was 5/5. (AR 215.) X-rays revealed

9    possible muscle spasm, minimal anterolisthesis of C2 upon C3 although she was not

10   symptomatic in that area, it was discussed with her. (AR 215.) Nothing acute was seen with

11   respect to the right shoulder. (AR 215.) Plaintiff was again diagnosed with cervical strain, right

12   shoulder strain, bilateral carpal tunnel and low back strain. (AR 215.) The plan was to continue

13   working on getting Plaintiff into physical therapy, and she was placed on modified duty of no

14   massages and was limited to a "sitting-type desk job four hours a day." (AR 216.)

15        The ALJ did not mention Dr. Jempsa's opinions regarding his assessment of the

16   modifications that should be made to Plaintiff's ability to work. If the ALJ believed these were

17   contradicted by another medical source, the ALJ should have provided specific and legitimate

18   reasons for rejecting these opinions. If they were not contradicted, the ALJ should have set forth

19   clear and convincing reasons for rejecting them. The Commissioner argues now that the ALJ's

20   assessment is justified because these modifications were not supported by Dr. Jempsa's own

21   clinical findings. This is not set forth in the ALJ's report. Instead, the ALJ only mentioned Dr.

22   Jempsa's clinical findings in connection with his assessment of Plaintiff's own credibility.

23   Therefore, the ALJ erred.

24        **2. Plaintiff's Credibility**

25        Finally, Plaintiff argues that in finding Plaintiff's testimony concerning the intensity,

26   persistence, and limiting effects of her symptoms not fully credible to the extent they are

27   inconsistent with the ALJ's RFC, the ALJ simply picked from the record unconnected positive

28   medical statements, failed to properly reject the opinions of the treating and examining doctors,

1   and failed to make specific findings as to what testimony she did not find credible. (Doc. # 13 at

2   17-20.) As a result, Plaintiff contends that Plaintiff's testimony should be credited and the

3   decision should be reversed and remanded for the payment of benefits. (*Id*. at 20-21.)

4   Conversely, the Commissioner contends that the ALJ provided a valid basis for not

5   finding Plaintiff fully credible, and her reasons are supported by substantial evidence. (Doc. # 16

6   at 13.) The Commissioner asserts that the ALJ detailed the physicians' reports and noted that the

7   objective medical evidence did not substantiate the extent of Plaintiff's subjective complaints and

8   alleged limitations. (*Id*.) The ALJ also relied on Plaintiff's conservative treatment and extensive

9   daily activities in counting against her credibility. (*Id*. at 14-15.)

10   "[A] claimant's credibility becomes important at the stage where the ALJ is assessing

11   residual functional capacity, because the claimant's subjective statements may tell of greater

12   limitations than can medical evidence alone." *Tonapetyan v.  Halter*, 242 F.3d 1144, 1147 (9th

13   Cir.  2001) (citing SSR 96-7p (1996)).  Thus, a claimant's credibility is often crucial to a finding

14   of disability.  The ALJ is responsible for determining credibility.  *Meanel v.  Apfel*, 172 F.3d

15   1111, 1113 (9th Cir.  1999); *Magallanes*, 881 F.2d at 750; *see also Lingenfelter v.  Astrue*, 504

16   F.3d 1028, 1035-36 (9th Cir.  2007).

17   In general, when deciding to accept or reject a claimant's subjective symptom testimony,

18   an ALJ must engage in two steps: an analysis under *Cotton v.  Bowen*, 799 F.2d 1403 (9th Cir.

19   1986) (the "*Cotton* test"), and an analysis of the credibility of the claimant's testimony regarding

20   the severity of his or her symptoms. *Smolen v.  Chater*, 80 F.3d 1273, 1281 (9th Cir.  1996); *see*

21   *also* 20 C.F.R. § 404.1529 (adopting two-part test).

22   First, under the *Cotton* test, a claimant who alleges disability based on subjective

23   symptoms "must produce objective evidence of an underlying impairment 'which could

24   reasonably be expected to produce pain or other symptoms alleged.'"  *Bunnell v. Sullivan*, 947

25   F.2d 341, 344 (9th Cir.  1991) (en banc) (citing 42 U.S.C. § 423(d)(5)(A)); *see also  Berry v.*

26   *Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010)*; Lingenfelter v.  Astrue*, 504 F.3d 1028, 1036 (9th

27   Cir.  2007). This test "imposes only two requirements on the claimant: (1) [he or] she must

28   produce objective medical evidence of an impairment or impairments; and (2) [he or] she must

1    show that the impairment or combination of impairments *could reasonably be expected to* (not

2    that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (emphasis

3    original); *see also* 20 C.F.R. § 404.1529(a)-(b).

4         "Second, if the claimant meets the first test, and there is no evidence of malingering, the

5    ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

6    specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal

7    quotation marks and citation omitted); *see also Valentine v. Comm'r of Soc.  Sec. Admin*., 574

8    F.3d 685, 693 (9th Cir.  2009). "This is not an easy requirement to meet: 'The clear and

9    convincing standard is the most demanding required in Social Security cases.'" *Garrison*, --- F.3d

10   ---, 2014 WL at * 16 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir.

11   2002)).

12        An ALJ's credibility findings are entitled to deference if they are supported by substantial

13   evidence and are "sufficiently specific to allow a reviewing court to conclude the adjudicator

14   rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a

15   claimant's [symptom] testimony.'" *Bunnell,* 947 F.2d at 345 (quoting *Elam v. Railroad*

16   *Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991)). "General findings are insufficient; rather,

17   the ALJ must identify what testimony is not credible and what evidence undermines the

18   claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted).

19        An ALJ may consider various factors in assessing the credibility of the allegedly

20   disabling subjective symptoms, including: daily activities; the location, duration, frequency, and

21   intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage,

22   effectiveness, and side effects of any medication taken to alleviate symptoms; treatment, other

23   than medication, received for relief of symptoms; any measures a claimant has used to relieve

24   symptoms; and other factors concerning functional limitations and restrictions due to symptoms.

25   20 C.F.R. § 404.1529(c)(3)(i)-(vii).

26        When analyzing credibility, an ALJ may properly consider medical evidence in the

27   analysis; however, the ALJ may not reject subjective pain testimony "on the sole ground that it is

28   not fully corroborated by objective medical evidence[.]" *Rollins v. Massanari*, 261 F.3d 853, 857

- 28 -

1   (9th Cir. 2001); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004)

2   (holding ALJ properly determined credibility where claimant's testimony was contradictory to

3   and unsupported by objective medical evidence).

4          The ALJ concluded that the objective medical evidence in the record did not fully support

5   Plaintiff's subjective complaints and alleged functional limitations. (AR 14.) The ALJ pointed

6   out that in February 2009, Plaintiff was examined (by Dr. Jempsa), and while she reported pain

7   and tenderness and limited range of motion in the cervical spine and right shoulder and

8   decreased sensation in the right hand. (AR 14.) The ALJ notes that the x-ray of Plaintiff's lumbar

9   spine was normal, and an x-ray of the cervical spine revealed possible muscle spasm and

10  minimal anterolisthesis. (AR 14.) The x-ray of the right shoulder showed nothing acute. (AR 14.)

11  The ALJ indicates Plaintiff was diagnosed with cervical strain, right shoulder strain, low back

12  strain and bilateral carpal tunnel, and physical therapy was recommended. (AR 14.) The ALJ

13  then reviewed MRI results from 2006 and 2005, which respectively showed minimal spondylotic

14  changes and mild degenerative disease in the cervical spine and degenerative changes and

15  possible tendonitis in the shoulder. (AR 14.)

16         Next, the ALJ reviewed Plaintiff's testimony that she had last worked in January 2009 as

17  a massage therapist and aesthetician, which required extensive use of her arms and hands.

18  (AR 14.) The ALJ recounted that Plaintiff's neck and low back caused her most problems and

19  she took ibuprofen, and needed a fifteen minute break between standing, walking and sitting, and

20  had headaches once or twice a week lasting from two to four hours. (AR 14.) The ALJ noted that

21  Plaintiff did not receive mental health treatment or take psychotropic medication. (AR 14.)

22         The ALJ reiterated that Plaintiff treated her pain complaints with ibuprofen only, and her

23  MRIs confirmed only mild degenerative changes in the cervical spine and shoulder. (AR 15.)

24  While she complained of tenderness and pain in range of motion, the ALJ said that objective

25  clinical findings were otherwise unremarkable. (AR 15.) The ALJ acknowledged Plaintiff's

26  bilateral carpal tunnel diagnosis, but pointed out that Plaintiff was never evaluated or treated by

27  an orthopedist, neurosurgeon or specialist and had no testing or additional therapy for this

28  condition. (AR 15.) The ALJ confirmed that Plaintiff was limited in her upper right extremity

consistent with her subjective complaints. (AR 15.) The ALJ likewise stated that Plaintiff was limited by her psychologically-based symptoms, but she was not under the care of a mental health specialist and did not receive treatment or medication for these issues. (AR 15.)

The ALJ's recitation of Plaintiff's treatment with Dr. Jempsa ignored his objective findings that Plaintiff did indeed have tenderness and muscle tightness along the paravertebral musculature and decreased range of motion in the cervical spine, tenderness and decreased range of motion in the right shoulder. (AR 215, 220.) The ALJ likewise ignored Dr. Jempsa's recommendation of physical therapy, and it appears Plaintiff's claim to treat with a physical therapist was denied by the insurance company. (AR 216, 221.) Finally, the ALJ made no mention of the modifications to Plaintiff's ability to work that were made by Dr. Jempsa, initially restricting her to no more than three massages per day for three days a week and then restricting her to no massages and a sitting desk-type job for four hours a day. (AR 221, 216.) Therefore, insofar as the ALJ used Plaintiff's treatment with Dr. Jempsa as a basis for rejecting her testimony, it was not supported by substantial evidence.

The ALJ's reliance on the 2005 and 2006 MRI results are similarly unsupportive of the ALJ's decision to find Plaintiff's subjective symptom testimony less than credible. Instead, the MRI results which showed some degenerative changes in the cervical spine and right shoulder are consistent with Plaintiff's complaints of pain. Moreover, Plaintiff testified that the reason she stopped working in 2009 was due to an injury which occurred during a massage which caused her to experience pain ever since. (AR 98.)

While the ALJ relied on the fact that Plaintiff did not seek further treatment for her carpal tunnel condition or her mental health limitations, the ALJ did not mention that Plaintiff testified that she had issues obtaining health insurance and did not have health insurance at the time she gave her testimony. (AR 99-100.) Nor did the ALJ discuss Plaintiff's testimony about her hands getting numb and swelling and causing her pain, for which she gets massages and takes ibuprofen and wears wrist braces. (AR 98-99.)

The ALJ acknowledged Plaintiff's testimony that she needed a fifteen minute break between standing, walking and sitting, and had headaches once or twice a week lasting from two

to four hours, but did not cite any reason for rejecting this subjective symptom testimony.

In fact, after the ALJ recounted portions Plaintiff's medical history for the purpose of discrediting her physical symptom testimony, she stated that that Plaintiff's subjective complaints were indeed consistent with her limitations in her upper right extremity. The ALJ also found that Plaintiff was limited by her psychologically-based symptoms, but apparently discredited Plaintiff because she was not receiving treatment or medication for her mental health limitations.

For these reasons, the court finds that the ALJ's basis for discrediting Plaintiff was not based on sufficient evidence. The Commissioner argues that the ALJ relied on Plaintiff's daily activities as a basis for finding her subjective symptom testimony less than credible; however, the ALJ barely mentioned Plaintiff's daily activities in her discussion of Plaintiff's credibility. (AR 14-15.) The ALJ generally referred to Plaintiff's daily activities in her summary of Dr. Rogina's findings, where she stated: "[Plaintiff] reported a full range of daily activities, limited by her current medical problems, which affected her mood." (AR 14.) The only other mention of Plaintiff's daily activities is in the ALJ's summary of Plaintiff's testimony: "She could perform some household chores with assistance." (AR 14.) As such, Plaintiff's daily activities cannot be characterized as a clear and convincing reason for rejecting Plaintiff's credibility.

Insofar as the Commissioner argues now that Plaintiff's daily activities are inconsistent with her subjective symptom testimony, the Ninth Circuit has stated:

> ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day.

*Garrison*, --- F.3d ---, 2014 WL 3397218, at * 17 (citing *Smolen*, 80 F.3d at 1287 n. 7; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "'[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.'" *Id*. (quoting *Reddick*, 157 F.3d at 722.

Plaintiff testified that in a typical day she does a lot of reading, and does what she can to help around the house such as occasionally helping with dishes, folding clothes and helping prepare food. (AR 100.) She testified that she could not put things in the washer because it aggravates the condition in her hands. (AR 100-101.) She is limited to fifteen minute increments

1   in assisting in household chores. (AR 102-103.) She further testified, as acknowledged by the

2   ALJ, that she gets headaches once or twice a week that last from two to four hours. (AR 104.)

3          Plaintiff's testimony regarding her ability to help with household chores is consistent with

4   the objective medical evidence with respect to her limitations on her hands and upper right

5   extremity.

6          With respect to her mental health limitations, the ALJ did not dispute that Plaintiff was

7   limited by her mental health issues, but discredited her because she was not seeing a mental

8   health provider for treatment or taking medication. As stated above, the ALJ failed to mention

9   that Plaintiff did not have health insurance at the time. Nor did the ALJ explain how the failure

10  to treat with a mental health care provider detracted in any way from her mental limitations.

11         In sum, the court finds that the ALJ did not set forth clear and convincing reasons

12  supported by substantial evidence for rejecting Plaintiff's credibility.

13                            **IV. CONCLUSION**

14         After carefully reviewing the record as a whole, the district court should find that the ALJ

15  erred in ignoring the medical opinions of Dr. Villaflor, Dr. Rogina and Dr. Jempsa and in

16  assessing Plaintiff's credibility.

17         The court must now address whether the case should be remanded to the ALJ for further

18  proceedings or whether it should be remanded to the ALJ for the award of benefits. "Usually,

19  '[i]f additional proceedings can remedy defects in the original administrative proceeding, a social

20  security case should be remanded.'" *Garrison*, --- F.3d ---, 2014 WL 3397218, at *19 (quoting

21  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)). "[C]ourts are empowered to affirm,

22  modify, or reverse a decision by the Commissioner, with *or without* remanding the cause for a

23  rehearing.'" *Id*. (quoting 42 U.S.C. § 405(g)) (emphasis original in opinion). In appropriate cases,

24  the court may remand to the ALJ with instructions to award benefits. *Id*. (citations omitted).

25         "'[W]here there are no outstanding issues that must be resolved before a proper disability

26  determination can be made, and where it is clear from the administrative record that the ALJ

27  would be required to award benefits if the claimant's excess pain testimony were credited, we

28  will not remand solely to allow the ALJ to make specific findings regarding that testimony.

1    Rather, we will ... take that testimony to be established as true.'" *Id.* (quoting *Varney v. Sec'y of*

2    *Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988)). This is known as the "credit-as-

3    true" rule. *Id.* The reasoning for this is:

4            Requiring the ALJs to specify any factors discrediting a claimant at the first
             opportunity helps to improve the performance of the ALJs by discouraging them
5            from reaching a conclusion first, and then attempting to justify it by ignoring
             competent evidence in the record that suggests an opposite result ... Moreover, it
6            avoids unnecessary duplication in the administrative hearings and reduces the
             administrative burden caused by requiring multiple proceedings in the same case
7            ... [It also] reduces the delay and uncertainty ... and ensures that deserving
             claimants will receive benefits as soon as possible ... [I]f grounds for [concluding
8            that a claimant is not disabled] exist, it is both reasonable and desirable to require
             the ALJ to articulate them in the original decision.

9    *Id.* at 20 (quoting *Varney*, 859 F.2d at 1398-99). The credit-as-true rule applies equally to

10   medical opinion evidence. *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498 (9th Cir. 1989)).

11           The Ninth Circuit has developed a three-part standard for the credit-as-true rule to

12   determine whether a case must be remanded to the ALJ with an order to calculate and award

13   benefits:

14           (1) the record has been fully developed and further administrative proceedings
             would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient
15           reasons for rejecting evidence, whether claimant testimony or medical opinion;
             and (3) if the improperly discredited evidence were credited as true, the ALJ
16           would be required to find the claimant disabled on remand.

17   *Id.* (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th Cir. 2008); *Lingenfelter*, 504 F.3d at

18   1041; *Orn*, 495 F.3d at 640; *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Smolen*, 80

19   F.3d at 1292).

20           This rule, however, provides "some flexibility." *Id.* at 21 (citing *Connett v. Barnhart*, 340

21   F.3d 871, 876 (9th Cir. 2003)). In describing the nature of this flexibility, the Ninth Circuit

22   recently stated: courts must "remand for further proceedings when, even though all conditions of

23   the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt

24   that a claimant is, in fact, disabled." *Id.*

25           The court will now address the credit-as-true conditions.

26           The first factor looks at whether the record has been fully developed and whether further

27   administrative proceedings would serve no useful purpose. The court is not permitted to remand

28   the case to allow the ALJ to revisit the medical opinions and claimant testimony that were

     improperly rejected. *Id.* at 22. As the Ninth Circuit stated, this would essentially allow the ALJ to

1   "have a mulligan." *Id*. This appears to be the only purpose for which the matter would be

2   remanded; therefore, this argument is foreclosed.

3        As to the second factor, as was explained in detail above, the ALJ failed to provide

4   legally sufficient reasons supported by substantial evidence for ignoring the medical opinions of

5   Dr. Villaflor, Dr. Rogina and Dr. Jempsa, and for discrediting Plaintiff's subjective testimony.

6        With respect to the third factor, the court must determine whether the crediting of the

7   evidence would require the ALJ to find Plaintiff disabled on remand. At this stage, the court does

8   "not consider arguments against crediting evidence that the ALJ did not make. In other words ...

9   we do not consider 'whether the ALJ *might* have articulated a justification for rejecting [an]

10  opinion.'" *Garrison*, --- F.3d ---, 2014 WL 3397218, at * n. 29.

11       This would credit Dr. Villaflor's opinion that Plaintiff was limited to only occasional

12  pushing or pulling with the right upper extremity. As indicated above, the hypothetical posed to

13  the vocational expert at step five did not include this limitation. While the Commissioner argues

14  that the job description provided in the DOT indicates no more than infrequent pushing or

15  pulling, a review of the job description does not provide a sufficient indication of whether the job

16  would involve more or less than occasional pushing or pulling in all directions. Moreover, this

17  was not an argument that the ALJ made in her original assessment of Plaintiff's RFC.

18       Crediting Dr. Rogina's opinions would mean that Plaintiff's ability to sustain employment

19  is marginal; that her mental limitations are chronic and stable; that she has a GAF of 50; that she

20  has moderate limitations in her ability to understand, remember and carry out complex

21  instructions and make judgment on complex work-related decisions and in her ability to interact

22  appropriately with supervisors and co-workers and a marked limitation in her ability to respond

23  appropriately to usual work situations and to changes in a routine work setting. Again, the court

24  cannot consider the Commissioner's arguments about justifications the ALJ might have made in

25  rejecting Dr. Rogina's opinions. The ALJ ignored these opinions and must endure the result.

26       Crediting Dr. Jempsa's findings would mean accepting his conclusions regarding her

27  objective condition relative to her right upper extremity, cervical spine and hands, as well as his

28  conclusions regarding her ability to work insofar as he placed various modifications on her

1    employment.

2         Finally, crediting Plaintiff's subjective symptom testimony regarding both her physical

3    and mental impairments would confirm her complaints regarding the pain in her neck, right arm

4    and shoulder, cervical spine and hands as well as her mental limitations.

5         On balance, crediting these medical opinions and Plaintiff's testimony would result in a

6    finding of disability. Plaintiff's treating doctor opined that Plaintiff could only work several days

7    out of the week and should be limited to a "desk-type" job for four hours a day. Plaintiff's own

8    testimony is that she can only sustain doing household chores for fifteen minutes. When the

9    vocational expert was asked about a hypothetical individual who would be absent, tardy or

10   depart early at least once per week, the vocational expert unequivocally responded that this

11   would "[p]reclude full-time competitive employment." (AR 110.) In addition, Dr. Rogina's

12   opinions that Plaintiff's ability to sustain employment was marginal, that her mental limitations

13   were chronic and stable, that she had marked limitations in her ability to respond appropriately to

14   usual work situations and changes in a routine work setting and had a GAF of 50 lead to a

15   finding of disability.

16        Concluding that Plaintiff satisfies all three prongs of the credit-as-true analysis, the court

17   must finally consider whether to exercise "flexibility" under *Connett* and *Garrison* and remand

18   for further proceedings. Again, this requires the court to look at the record as a whole and

19   determine whether it creates a serious doubt as to whether Plaintiff is in fact disabled. The court

20   finds that it should not exercise such "flexibility." The court acknowledges the arguments made

21   by the Commissioner as to why Plaintiff should not be considered disabled that were not asserted

22   by the ALJ, including the reference to Plaintiff's daily activities and portions of Dr. Rogina's

23   report that support the Commissioner's determination.

24        First, as to Plaintiff's daily activities, the court is mindful of the admonition that caution

25   should be exercised in concluding that an ability to do some daily activities is inconsistent with

26   testimony about pain. *Garrison*, --- F.3d ---, 2014 WL 3397218, at 17. Plaintiff's ability to talk

27   on the phone, take short walks and assist with some household chores does not translate into a

28   conclusion that she is not disabled. "[M]any home activities are not easily transferable to what

1    may be the more grueling environment of the workplace, where it might be impossible to

2    periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989.) For

3    example, Plaintiff testified that she can only do chores such as folding laundry or helping with

4    dishes in 15 minute increments before she has to rest or do something else to avoid the pain in

5    her hands. Her ability to fold laundry for fifteen minutes is not likely transferable to the

6    workplace where she would not be allowed to take a break from her activity every fifteen

7    minutes. *See Garrison*, --- F.3d ---, 2014 WL 3397218, at 17 (finding that "[t]he ability to talk on

8    the phone, prepare meals once or twice a day, occasionally clean one's room, and, with

9    significant assistance, care for one's daughter, all while taking frequent hours-long rests,

10   avoiding any heavy lifting, and lying in bed most of the day" were consistent with the claimant's

11   subjective symptom testimony).

12          Second, while the Commissioner characterizes Dr. Rogina's report as supporting a

13   determination that Plaintiff is not disabled, the Commissioner, like the ALJ, ignores the portions

14   of Dr. Rogina's assessment that are unfavorable to the Commissioner's position—in particular,

15   the finding that Plaintiff's ability to sustain employment is marginal and that her condition is

16   chronic and stable.

17          In sum, the court concludes that Plaintiff satisfied the conditions of the credit-as-true rule

18   and a review of the record discloses no reason to seriously doubt she is disabled. Therefore, the

19   matter should be remanded for calculation and award of benefits.

20                                      **V. RECOMMENDATION**

21          **IT IS HEREBY RECOMMENDED** that the Commissioner's Cross-Motion to Affirm

22   (Doc. # 16) be **DENIED** and that Plaintiff's Motion for Reversal of the Commissioner's Decision

23   (Doc. # 13) be **GRANTED** and the case be **REMANDED** to the ALJ for the calculation and

24   award of benefits.

25   ///

26   ///

27   ///

28   ///

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: July 22, 2014

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE